# AFFIDAVIT

I, BROOKS ABRAMSON, being first duly sworn on oath, depose and state as follows:

## AGENT BACKGROUND AND EXPERIENCE

1.      I am a Special Agent with the United States ("U.S.") Department of Labor, Office of Inspector General ("DOL-OIG") and have been so employed since 2013.  Prior to my current occupation, I was a uniformed law enforcement officer of the U.S. Customs and Border Protection and a criminal investigative analyst of the U.S. Department of State's ("DOS") Diplomatic Security Service for four years.  I received training in federal laws at various law enforcement academies, including the U.S. Customs and Border Protection Law Enforcement Academy, the Criminal Investigator Training Program and the Inspector General Investigations Training Academy at the Federal Law Enforcement Training Center at Glynco, Georgia.  I have participated in investigations involving violations of various federal laws, including visa and other complex frauds, mail and wire fraud schemes and human trafficking crimes ranging from forced labor to sex trafficking through the use of force, fraud and coercion.  As a Special Agent, I have participated in the execution of numerous federal search warrants and subsequent analyses of evidence collected.

2.      The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel during the course of their official duties and from persons with knowledge regarding relevant facts, all of whom I believe to be truthful and reliable.

## PURPOSE OF THE AFFIDAVIT

3.      I make this affidavit in support of applications for a warrant, pursuant to Federal Rule of Criminal Procedure 41, to search certain buildings on the premises known as the

**Walworth County Fairgrounds**, 411 East Court Street, Elkhorn, Wisconsin, 53121 (hereinafter the "**Fairgrounds**"), specifically (1) the offices of the Walworth County Agricultural Society, also known as the **Katzman Administration Building**; and (2) the **employee lodging trailer** (hereinafter the "**trailer**") located at the northeast section of the **Fairgrounds** and surrounded by an ovular dirt track; further described in Attachment A of this Affidavit.

4. I also make this affidavit in support of a criminal complaint charging **Denis Leonel Rodriguez Oyuela** with Title 18, United States Code, Sections 371 and 1351(a) (conspiracy to commit fraud in foreign labor contracting) and 1594(b) (forced labor conspiracy), and Title 8, United States Codes Sections 1324(a)(1)(A)(iii)-(iv), (V)(I)-(II), (B)(i) (aiding and abetting and conspiracy to bring in and harbor certain aliens for financial gain); and an arrest warrant for **Denis Leonel Rodriguez Oyuela**.

5. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not set forth all my knowledge about this matter. Witness/victim interviews and conversations referenced in this affidavit are in summary form and do not purport to be verbatim recitations or translations of those interviews. Dates, times, dollar values, and government figures referenced are approximations.

## PROBABLE CAUSE

6. Since July of 2021, the Federal Bureau of Investigation, the U.S. Department of State Diplomatic Security Service, Homeland Security Investigations, and the U.S. Department of Labor, Office of Inspector General, have been investigating management and staff of the Walworth County Agricultural Society ("WCAS"), including redacted as well as **Denis Leonel Rodriguez Oyuela**, redacted redacted , purported Honduran government officials, and others regarding various

2

immigration and forced labor crimes that have been committed in, around, and in connection with the **Fairgrounds**.

7.     Based on the information set forth in this affidavit, there is probable cause to believe that at the premises described in paragraph 3, there exists evidence of substantive violations of Title 18, United States Code, Sections 1001 (false statements), 1351(a) (fraud in foreign labor contracting), 1546 (fraud and misuse of visas, permits, and other documents), 1341 (mail fraud), 1343 (wire fraud), 1589 (forced labor), and 1590 (trafficking with respect to forced labor); and Title 8, United States Codes Sections 1324(a)(1)(A)(iii)-(iv), (B)(i) (bringing in and harboring certain aliens for financial gain), as well as conspiracies to violate those statutes.

8.     There is also probable cause to believe that **Denis Leonel Rodriguez Oyuela** has committed violations of Title 18, United States Code, Sections 371 and 1351(a) (conspiracy to commit fraud in foreign labor contracting) and 1594(b) (forced labor conspiracy), and Title 8, United States Codes Sections 1324(a)(1)(A)(iii)-(iv), (V)(I)-(II), (B)(i) (aiding and abetting and conspiracy to bring in and harbor certain aliens for financial gain).

## I.     BACKGROUND ON THE U.S. H-2B VISA PROGRAM

9.     From consular and immigration training, I know that foreign nationals cannot work for pay in the U.S. without prior authorization from the U.S. government.  Foreign nationals may obtain work authorization in the U.S. through a nonimmigrant visa petitioned for on their behalf by a qualifying U.S.-based employer.[1]  A nonimmigrant visa allows a foreign national to enter the U.S. temporarily, to fulfill a specific purpose.[2]

10.     One means by which foreign nationals can obtain authorization to work for pay in the U.S. is by obtaining an H-2B nonimmigrant visa through a U.S.-based non-agricultural

---

[1] There are limited exceptions to this general procedure, not applicable here.
[2] 8 U.S.C. § 1101(a)(15).

3

employer.[3]  This U.S. visa program allows foreign workers to perform temporary work in the U.S., so long as no unemployed U.S. workers can fill that job.[4]  The H-2B visa allows a foreign national to work in the U.S. for a maximum uninterrupted period of three years.[5]  To sponsor foreign guest workers for the H-2B visa, the prospective U.S.-based employer must submit information to the DOL, Department of Homeland Security ("DHS") / U.S. Citizenship and Immigration Services ("USCIS"), and, in most cases, DOS.

11.     Generally, the Immigration and Nationality Act ("INA") limits the annual number of foreign workers who may be issued an H-2B visa to 66,000, with 33,000 for workers who begin employment in the first half of the fiscal year (October 1 - March 31) and 33,000 for those who begin employment in the second half of the fiscal year (April 1 - September 30).[6]  The H-2B visa, therefore, is a finite U.S. government benefit.

12.     Before an employer can file an H-2B application, they must register with the U.S. DOL around four to six months prior to the company's need for workers.  It is during this time that the U.S. employer indicates the temporary need for foreign labor, to include the number of positions requested, the period of employment, and the nature of services or labor.  In addition, the employer must request and obtain a prevailing wage rate from the U.S. DOL starting approximately two months before the date of need.  The pay rate required for H-2B workers is a formula-based rate designed not to adversely affect U.S. workers and is generally based on the type and location(s) of the purported job classification as specific by the U.S.-based employer.

---

[3] 8 U.S.C. § 1101(a)(15)(H)(ii)(a).
[4] Immigration and Nationality Act ("IA") 101(a)(15)(H)(ii)(b), 8 U.S.C. 1101(a)(15)(H)(ii)(b); see also 8 CFR 214.1(a)(2).
[5] 8 C.F.R. § 214.2(viii)(b).
[6] INA Sections 214(g)(1)(B) and 214(g)(10), 8 U.S.C. 1184(g)(1)(B) and 1184(g)(10).

4

13.    After receiving the prevailing wage rate, the U.S. employer posts a job order with the State Workforce Agency in the state of intended employment in order to test the local job market for interested U.S. applicants.[7]  Upon the work order being accepted by the State, the U.S. employer must also engage in local recruitment efforts as directed by the U.S. DOL.[8]

14.    Upon satisfying the testing of the local job market, the U.S. employer can submit a DOL Form 9142 Application for Temporary Employment Certification ("ATEC") to the U.S. DOL seeking labor certification.  The ATEC, with few exceptions not applicable here, is transmitted to the DOL via electronic transmission to the Frances Perkins Building, 200 Constitution Avenue Northwest, Washington, D.C.  This labor certification is the first step in the H-2B visa process and requires both the employer (also referred to as the "petitioner") and preparer to made certain attestations, including the wages to be paid and the locations at which the prospective H-2B workers will work.  An appendix to the ATEC requires the following attestations, among others, to be executed by the employer:

a.    "The offered wage is not based on commissions, bonuses or other incentives, unless the employer guarantees a wage earned every workweek that equals or exceeds the offered wage."

b.    "During the period of employment that is the subject of this application, the employer will comply with applicable Federal, State and local employment-related laws…"

c.    "The employer and its agents, attorneys, and/or employees have not sought or received, and will not seek to receive, payment of any kind from the worker for any activity related to obtaining certification or employment, including but not limited to payment of the employer's attorney or agent fees, application or petition fees, or recruitment costs.  Payment includes, but is not limited to, monetary payments, wage concessions (including deductions from wages, salary, or benefits), kickbacks, bribes, tributes, in kind payments, and free labor."

d.    "Upon the separation from employment of any H-2B or U.S. worker(s) employed under this application, if such separation occurs prior to the end date of

---

[7] 20 CFR 655.15(b), and 20 CFR 655.16(a).
[8] 20 CFR 655.15, 655.30, 655.31, 655.32, 655.33.

5

the employment specified in this application, the employer will notify the Department in writing of the separation from employment not later than 2 work days after such separation is discovered by the employer. The employer will also notify DHS in writing (or any other manner specified by DHS) of such separation of an H-2B worker."

e.        "The employer will not place any H-2B workers employed pursuant to this application outside the area of intended employment or in a job classification not listed on the approved application unless the employer has obtained a new approved Form ETA- 9142B."

f.        "The employer will make all deductions from workers' paychecks required by law and only those additional authorized and reasonable deductions disclosed in the job order. Deductions not disclosed will be prohibited. Reasonableness of authorized deductions is determined under the principles stated in 29 CFR part 531. The wage payment requirement in condition 5 of this Declaration will not be met where unauthorized or unreasonable deductions, deposits, rebates, or refunds reduce the wage payment below the offered wage or where the worker "kicks back" any part of the wages to the employer or another person for the employer's benefit."

g.        "The employer will cooperate with any agent of the Secretary of Labor who is exercising or attempting to exercise the Department's authority pursuant to 8 U.S.C. 1184(c), including investigations as described in 29 CFR 503.25."

h.        "The employer will retain all documents pertaining to this application and registration, the recruitment-related documents, the payroll records, and related documents for 3 years as required by the regulations at 20 CFR 655.56 and 29 CFR 503.17."

15.        After these attestations, the U.S. employer must affix his or her full name, title, and date of signature under an advisement banner reading: "I declare under penalty of perjury that I have read and reviewed this application and that to the best of my knowledge the information contained therein is true and accurate. I understand that to knowingly furnish false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by a $250,000 fine or 5 years in the Federal penitentiary or both (18 U.S.C. 1001)."

16.        If the U.S. employer uses a preparer for their ATEC, then the top of this appendix also bears the preparer's full name, business name, email address, date signed and signature under

an advisement banner reading: "I hereby declare under penalty of perjury that I am an attorney for the employer, or that I am an employee of, or hired by, the employer listed in Section C of the Form ETA-9142B, and that I have been designated by that employer in accordance with 20 CFR 655.8 to act on its behalf in connection with this application, as evidenced by the attached agency agreement. I also certify that to the best of my knowledge the information contained herein is true and accurate, including the employer's declaration regarding activities I have undertaken on the employer's behalf in connection with this application. I understand that to knowingly furnish false information in the preparation of this form and any supplement hereto or to aid, abet, or counsel another to do so is a felony punishable by a $250,000 fine or 5 years in a Federal penitentiary or both (18 U.S.C. 1001)."

17. Upon the aforementioned parties receiving certification from the Secretary of Labor through U.S. DOL, the U.S.-based employer performs the final step in the H-2B visa application process by submitting a DHS Form I-129 Petition for a Nonimmigrant Worker (commonly referred to as a "petition") to the U.S. Secretary of Homeland Security through USCIS. The I-129 package is submitted to the USCIS by mail or common carrier, and routes to the USCIS's California Service Center, Laguna Niguel, California. This petition typically contains relevant portions of the DOL ATEC as an attachment. This petition requests USCIS approve a specific number of named or unnamed foreign workers, and attests to many of the same particulars as listed on the ATEC, including the rate of pay and duration and location of work. The U.S.-based employer again attests to the information contained in the petition by provide the name, title and signature of an authorized company signatory under an advisement banner reading, in relevant part, "I certify, under penalty of perjury, that I have reviewed this petition and that all of the information contained

7

in the petition, including all responses to specific questions, and in the supporting documents, is complete, true and correct."

18.     If the U.S. petitioner uses a preparer for the petition, the preparer also provides a signature and date under an advisement banner reading, "By my signature, I certify, swear or affirm under penalty of perjury, that I prepared this petition on behalf of, at the request of, and with the express consent of the petitioner or authorized signatory.  The petitioner has reviewed this completed petition as prepared by me and informed me that all the information in the form and in the supporting documents, is complete, true and correct."

19.     Upon USCIS approving the petition, the DOS processes the petition and informs eligible U.S. embassies or consulates overseas for the purposes of scheduling H-2B eligibility interviews for prospective foreign guest workers.

20.     Upon overseas U.S. State Department officials approving applicants for H-2B visas, those applicants may apply for admission by presenting themselves to officials of the U.S. Customs and Border Protection at the U.S. border or its functional equivalent (*e.g.*, a U.S. airport or seaport).

## II.     OVERVIEW OF LABOR TRAFFICKING AND OTHER CRIMINALITY IN U.S. GUEST WORKER VISA PROGRAMS

21.      Despite the attestations made to the U.S. government pertaining to H-2B foreign guest worker protections, there continue to be vulnerabilities in the H-2B visa system.  For my entire law enforcement career, I have investigated such vulnerabilities.  I have conducted hundreds of interviews of foreign national U.S. visa holders, consulted with foreign and U.S. government officials within the consular communities familiar with the vulnerabilities of the H-2B program, and investigated and participated in the prosecution of dozens of criminal defendants for abuses of these programs.

8

22.     From my training and experience, I know that one of the primary factors that facilitates the exploitation of H-2B guest workers is poverty in guest workers' home countries. Due in part to travel affordability for prospective foreign workers and their U.S. petitioners, the most common areas from which H-2B laborers are drawn are impoverished areas of North American countries.   For example, according to U.S. DOS statistics for Fiscal Year 2020, approximately 89% (or 54,900/61,865 H-2B issuances) of all H-2B's were issued in North America, with Mexico, Jamaica, Guatemala, and Honduras being the highest volume countries for issuance.[9]

23.     Because the H-2B visa program does not require any specialized knowledge or training and is a manual labor visa, the program appears especially attractive to foreign nationals seeking lawful opportunities to come to the U.S. to earn money in various permissible H-2B industries.   These prospective workers are only authorized to work for the sponsoring U.S. employer, so many foreign guest workers feel tethered to their employer, facing the prospect of not being selected for future H-2B visas if they do not fulfill their labor requirements as directed by the employer.

24.     When unscrupulous U.S. petitioners or their agents take advantage of this power imbalance, foreign guest workers can be subjected to exploitative labor conditions that are different than first promised.

25.     Aside from trafficking and exploitation, I have investigated and participated in the prosecution of various visa fraud crimes which involve some combination of malfeasant U.S. petitioners, their recruiters, and/or agents.   In one common scheme I have investigated, commonly referred to as "petition padding," companies, recruiters, or preparers collude to seek more visa

---

[9] U.S. Dept. Of State, *FY 2020 Nonimmigrant Visas Issued* (2020), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant Statistics/NIVDetailTables/FY20NIVDetailTable.pdf.

9

applicants on their petition than are needed for the job opening. Upon getting approved for this "padded" number of workers, and upon H-2B workers entering the U.S., the schemers send the often-unwitting U.S. visa workers to previously undisclosed employers and worksites and reap financial benefits from illicit labor "leasing."

## III.  FEDERAL CRIMINAL INVESTIGATION INTO WALWORTH COUNTY AGRICULTURAL SOCIETY

### A.  Tip from NGO A

26.      In July 2021, I learned from a Wisconsin-based non-governmental organization ("NGO"), NGO A, that several Honduran nationals present in the Eastern District of Wisconsin and the Northern  District of Illinois had reported fraud and abuse in connection with H-2B visa work. [10]  Specifically, I learned that Adult Victims ("AVs") 1-4 came to the U.S. lawfully on H-2B visas to work for ████████ [redacted] ████████, doing business as ████ [redacted] ████ ██ [redacted] ███ a landscaping company headquartered in Grand Rapids, Michigan. However, upon entering the U.S., AVs 1-3 were re-routed to the State and Eastern District of Wisconsin to perform cleaning and concessions work at the Walworth County Agricultural Association (WCAS) **Fairgrounds** during various fairs and events.  AV-4, meanwhile, was sent to work for a traveling fair in Kane County, Illinois.

27.      AVs 1-4 reported to NGO A that their living conditions were poor, and their movements were controlled by another Honduran H-2B visa holder whom they knew as "Denis Rodriguez," later identified as **Denis Leonel Rodriguez Oyuela** (b. July 29, 1984), and that they were being threatened with deportation in order to induce their compliance with the illegal scheme.

---

[10] NGO A is funded in part through U.S. and State government grants and participates in, among other things, outreach to migrant, visa and undocumented workers throughout the Midwest to provide various forms of services, including services for victims of human trafficking.  I have received information from NGO A in the past and consider the information they provide to be generally trustworthy.

The AVs also expressed fear that **Rodriguez Oyuela** intended to unlawfully move them again to California to cut pine trees, and then to Alaska to filet salmon.

28.     Around the time NGO A reported these circumstances to law enforcement, I also learned that the AVs had made human trafficking complaints to NGO B, which runs a national-level human trafficking hotline.  NGO B also interfaces with U.S. embassies and consulates to advise foreign guest workers of their rights in the U.S.

29.     On July 30, 2021, I called 262-723-3228, the phone number for the Walworth County Fairgrounds listed on common internet search engines.  An unknown female answered the phone, and she confirmed that the WCAS operates out of a building near Highway 11 in Elkhorn, Wisconsin, which I believe to be the **Katzman Administration Building**.

**B.  H-2B Petition Research**

     **i.  Petition for** redacted **(2021)**

30.     I began my investigation by reviewing current H-2B petitions for redacted redacted t.  I found a petition dated February 1, 2021 that was prepared by redacted of redacted ., an apparent non-attorney registered agent for H-2B petition preparation, who signed this petition under penalty of perjury. The petition also included a signature by redacted dated February 1, 2021 attesting to the information contained in the petition under penalty of perjury.

31.     The redacted petition requested 46 Mexican H-2B workers for the period of April 1 through November 30, 2021 and requested visa issuance through the U.S. Consulate in Nuevo Laredo, Mexico.  The total number of H-2B visas ultimately approved for this petition on February 10, 2021 was 40.

32.     The records I reviewed revealed that while the petition was entirely for Mexican workers, 6 of the 40 H-2B visas ultimately issued were actually for Honduran workers, including AVs 1-4 and two other Honduran nationals (hereinafter referred to as "H-2B 5" and "H-2B 6"). The Honduran workers entered the U.S. on June 3, 2021, allegedly destined for [redacted]  This was the first time any of these H-2B workers had ever entered the U.S.[11]

33.     [redacted] purported in its petition that they would employ AVs 1-4 and the other two Honduran men on that petition between April 1 and November 30, 2021, that they would work landscaping jobs in Grand Rapids, Comstock Park, Kalamazoo, Holland, or Muskegon, Michigan, and that [redacted] would pay them $15.40 per hour worked.[12]

34.     The [redacted] petition contained no information regarding potential employment of any of the H-2B workers with the WCAS, either at the **Fairgrounds** or anywhere else in the Eastern District of Wisconsin.  I also checked government visa databases to determine if WCAS might have filed an amended petition with the U.S. government to request that anyone from the [redacted] petition, including AVs 1-3 or H-2B 5, work at WCAS.  As of the date of this application, I am not aware of any lawful authority for WCAS to employ AVs 1-3 or H-2B 5 at the **Fairgrounds** for H-2B visa work.  Likewise, I did not find any pending immigration petitions for benefits allowing any of the six [redacted] petition H-2Bs to work at the **Fairgrounds** or in the Eastern District of Wisconsin.

35.     During the course of this investigation, I became aware that, to date, five of the six H-2B visa workers on the aforementioned petition from [redacted] (AVs 1-4 and H-2B 6) have fled their

---

[11] While I believe these other two Honduran nationals are also victims, according to NGO A, they have not provided statements to law enforcement due to fear of reprisal either in the U.S. or Honduras.  U.S. Law Enforcement continues to make efforts to locate and identify these victims.

[12] I also know from experience and consultation with the U.S. DOL's Wage and Hour Division that H-2B landscape workers typically earn an overtime rate of $23.10 for all hours worked over 40 weekly hours.

unlawful and exploitative work situations.  I conferred with USCIS, and based on what I learned, it appears that as of the date of this application, no one—including redacted, WCAS, and Jredacted redacted has reported any of them as having absconded as required.

### ii.  Petition for WCAS (2020)

36.     Although none of the AVs were authorized to work at WCAS, I checked consular and immigration databases to see if any other H-2B workers were authorized to be at WCAS.  I located a petition submitted by WCAS to the U.S. government on January 28, 2020 that authorized WCAS to sponsor up to six H-2Bs.  Upon approval of that petition, WCAS brought six Honduran nationals on H-2Bs to the Eastern District of Wisconsin: B.J.C.C., N.A.H.S, E.A.M.N, L.F.R.H., S.O.R.R., and **Rodriguez Oyuela**.

37.     The January 2020 WCAS petition listed its authorized representative as redacted redacted General Manager.  It sought six unnamed H-2B workers to work as "Amusement and Recreation Attendants" who would earn $9.77 per hour between April 1, and September 30, 2020. This work was to take place at the **Fairgrounds**.

38.     Internet searches for WCAS show that redacted is a General Manager and member of the Walworth County Fairgrounds management staff.  It appears WCAS is the corporation responsible for oversight of the **Fairgrounds**, which host the Walworth County Fair and various other events throughout the year.

39.     Although the petition lists a primary address of P.O. Box 286, Elkhorn, Wisconsin 53121, the physical address given for WCAS was that of the **Fairgrounds**.  The **Katzman Administration Building** is one of several buildings located on the **Fairgrounds** and the administration center for WCAS's business operations.

13

40.     The WCAS Petition was signed by ███████ on January 27, 2020, attesting to the information contained in the aforementioned petition under penalty of perjury.[13]  This petition was also prepared by ████████████████████████████████████, the same apparent non-attorney registered agent who prepared the above-described ████ petition. ███████ also signed this petition under penalties of perjury on January 27, 2020.

41.     I noted that the individual H-2B applications submitted to the U.S. Embassy in Tegucigalpa, Honduras by **Rodriguez Oyuela** and the other five Honduran nationals on the 2020 WCAS petition all list the **Fairgrounds** as their workplace, ███████ their employer, and ███████ as their contact or petition preparer.

42.     **Rodriguez Oyuela** and the other five Honduran nationals entered the U.S. on June 18, 2020 using their WCAS H-2B visas, which were set to expire on September 30, 2020.  Just over five weeks later, however, or about July 28, 2020, the WCAS petition was amended to reflect a new purported employer of a California tree company, and the validity of the visas was extended through December 31, 2020.  Around December of 2020, their H-2B visa petition was amended again.  The new purported work location on this extension was to be a fishery in Alaska, and the validity of the visas was extended through October 10, 2021.

43.     At present, although **Rodriguez Oyuela** is known to be working at the **Fairgrounds** for WCAS, his H-2B visa only authorizes him to be working at the aforementioned Alaskan fishery.

---

[13] I noted that ███████ signature on the WCAS petition matches ███████s signature on his U.S. passport application of October 11, 2017, which lists his employer as "Walworth County Fairgrounds."  The phone number in the passport application is the same as the one of the phone numbers listed for ███████ in the 2020 WCAS H-2B petition.

### iii. Incomplete Petition for WCAS (2021)

44.     I also learned that WCAS began a petition to bring H-2B workers to the Eastern District of Wisconsin for the 2021 season, however it was never completed.

45.     On March 2, 2021, the DOL certified WCAS' Application for Temporary Employment Certification ("ATEC"), meaning WCAS was deemed eligible to request H-2B workers for the period of April 1, 2021 through September 30, 2021.

46.     The next step would have been for WCAS, or J▮redacted▮as WCAS' preparer, to submit the ATEC certification to USCIS with a request for workers, however I was unable to find records that this was ever submitted to USCIS for final adjudication and visa issuance.

### C.  Prior Criminal Investigation of ▮redacted▮ for Visa Fraud

47.     During my investigation, I have also learned that between May 2012 and July 2015, ▮redacted▮ was federally investigated for H-2B visa "petition padding" that had been occurring since at least June of 2008. That investigation revealed that ▮redacted▮, through ▮redacted▮ had engaged in a pattern of petitioning for more workers than the companies whose petitions he prepared needed or requested.

48.     ▮redacted▮told law enforcement that he padded petitions because workers would frequently abscond, and he preferred to have workers ready for various other employers and projects than to have to restart the petition process to replace them.  ▮redacted▮also admitted that, due to the annual H-2B visa issuance cap, it was easier for him to file petitions with inflated numbers and to reassign the additional workers to other jobs than it was to file accurate petitions on behalf of each company he worked with.  Additionally, ▮redacted▮ admitted that he had H-2B workers living and working in his own offices, even though their visas only authorized them to work for other employers and was paying them in cash.

49.     Numerous businesses were interviewed in relation to their H2-B applications submitted through ▮redacted▮ Those businesses all indicated that their requests to J▮redacted▮ had been for far fewer workers than were ultimately applied for and approved.  For instance, one company requested 8 workers, however the petition ▮redacted▮ filed on the company's behalf requested 20 workers. Agents further verified with four towns/organizations in Wisconsin and Illinois that while J▮redacted▮ had petitioned to admit H-2B workers to work for a certain amusement company to staff alleged festivals in those locations, no such festivals were ever planned or held.

50.     On June 6, 2013, federal agents warned ▮redacted▮ these practices violated federal law and may subject him to criminal prosecution if they continued.

### D.  Statements of the Victims

51.     On July 15, 2021, law enforcement entered the Walworth County **Fairgrounds** to covertly verify the presence and safety of AVs 1-3 and H-2B 5.[14]  I saw AVs 1 and 3 driving apparent WCAS work carts, changing fairground garbage cans, and interacting with fairground staff.

52.     Within a matter of days, due to safety concerns, NGO A removed AVs 1-4 from their various illegal and exploitative situations and took them to a safe location in the Eastern District of Wisconsin.  Between July 21, 2021 and the date of this application, other law enforcement agents and I interviewed AVs 1-4.  AVs 1-4 made statements against their penal and financial interests to law enforcement and received no promises from law enforcement regarding immigration benefits or non-prosecution, nor did law enforcement make payments to them for the information they provided.  The AVs made statements pertaining to alleged criminal conduct at or

---

[14] The **Fairgrounds** are open to the public through multiple walk-up entrances.  There were dozens of other citizens walking freely throughout and camping upon the fairgrounds during the time law enforcement attempted to locate AVs 1-3.  Law enforcement investigators did not enter any private structures or areas on the **Fairgrounds**.

16

connected to the **Fairgrounds** and the Eastern District of Wisconsin, which are generally synopsized below.

### i. Statements Made by AV-1

53.     AV-1 is a 39-year-old male, married with children, who grew up in an impoverished area of Honduras. He saved limited money and asked his family for assistance and took out loans for the purpose of attending secondary schooling to study electrical engineering. AV-1 usually earned the equivalent of around $800 monthly working in the telecommunications industry.

54.     As the COVID-19 pandemic affected the global economy and resulted in slowing business, AV-1 decided to attend some job fairs hosted by the Procuraduría De Trabajo de Honduras ("PTH"), which I understand from Spanish language proficiency and research to be an agency of the Honduran government akin to the U.S. Department of Labor.

55.     After the pandemic began to subside, AV-1 received communications from a purported government official with the PTH (hereinafter Government Official 1 or "GO-1") informing AV-1 he was eligible for an H-2B visa application to come to the U.S.[15] GO-1 said AV-1's work a landscaping job at the Michigan-based business sites of redacted and would earn $15.40 per hour as a regular rate and $23.10 per hour for overtime. GO-1 memorialized these H-2B visa terms on a Spanish language work order for AV-1, and these terms matched the particulars of the redacted U.S. petition.

56.     AV-1 believed GO-1 to be a Honduran government official because he met GO-1 in the Honduran Capital, Tegucigalpa, inside of a Honduran government building. It was through GO-1 that AV-1 learned of the additional five H-2B workers who would eventually travel with him to the U.S. GO-1 told AV-1 that redacted had found AV-1 the work in the U.S. and that

---

[15] Law enforcement continues to investigate whether GO-1 is actually an official of the Government of Honduras.

[redacted] point of contact in the U.S. would be "Denis," whom AV-1 identified from a photograph of **Rodriguez Oyuela**. AV-1 was told that the group was only authorized to work in Michigan.

57. AV-1 and the other victims first arrived at Houston, Texas, then flew to Chicago's O'Hare International Airport. Once they arrived in Chicago, one of the other victims received a message from [redacted] instructing AVs 1-3 and H-2B 5 to get in one vehicle outside of the airport, while the other two were to get into another vehicle.

58. AV-1 and his group were picked up by a Mexican male whom they came to know as "Raul" in a white work van. AV-1 later learned that Raul operates a Mexican festival on the WCAS fairground and is friends with [redacted]. AV-1 began following the route they were taking in the van on a map program on his phone and noticed that they were headed into Wisconsin rather than Michigan. AV-1 did not feel safe, and periodically sent his GPS coordinates to his wife in Honduras.

59. Upon arriving at the **Fairgrounds**, the visa workers were greeted by General Manager [redacted] Grounds and Maintenance Manager [redacted], a Mexican female crew boss whom they came to know as "Cristina," and **Rodriguez Oyuela**. **Rodriguez Oyuela** took the AVs to a **trailer**, where the AVs stayed in a joint room with bunkbeds and Oyuela stayed in a private room with a bathroom. The AVs could not use the bathroom in the **trailer**; rather, they had to use a public restroom and shower trailer around 150 yards from the **trailer**.

60. The next day, Cristina brought AVs 1-3 and H-2B 5 employee paperwork, some of which had to do with taxes. When they tried to put the WCAS's address on their employment paperwork, Cristina told them she had spoken to [redacted] and that [redacted] had said they could not put the WCAS address on their paperwork. Later, when they tried to get their U.S. social security cards, [redacted] stopped them on the WCAS grounds and told them not to use the WCAS address,

18

but rather redacted' address in Texas. AVs 1-3 and H-2B 5 never finished filing out their employment paperwork because Cristina took it away when they listed the WCAS address.

61.     When AVs 1-3 and H-2B 5 began working, it had nothing to do with landscaping as purported on their visa documents. They instead picked garbage, repaired tables, cleaned animal manure, fumigated weeds with chemicals, and worked in food stalls.

62.     **Rodriguez Oyuela** and Cristina were in charge of the AVs because they spoke Spanish. AV-1 is black with a dark complexion, while Cristina is Mexican with comparatively lighter skin. AV-1 believes Cristina looked down on him because of his skin color. Cristina often called AV-1 and the others "flojo" or "lazy," but she singled out AV-1 with insults such as "gorilla," "mono," or "chango," which are all racially derogatory references to types of apes or monkeys.

63.     AV-1's schedule was unpredictable; some days were slow, whereas weekends were very busy. During festivals, AV-1 might work 14 hours per day, whereas during the week, there may have been a lot of downtime. Whatever the case, AV-1 was constantly on call, with **Rodriguez Oyuela**, Cristina, or other WCAS personnel able to call on the AVs any time of the day or night.

64.     AV-1 received his weekly pay from a few different WCAS staff members, including redacted and Cristina. WCAS staff would bring AV-1 a paycheck from the **Administration Building**, and AV-1 would sign the back. These checks bore AV-1's name and said "redacted."[16] WCAS staff would return to the **Administration Building** with the endorsed check, then reapproach AV-1 with an envelope

---

[16] This address was on the H-2B petition that redacted prepared to bring the AVs to the U.S.

bearing WCAS's seal. The envelope would contain cash totaling the net amount of the check AV-1 had just signed.

65.     AV-1 has been inside the **Fairgrounds**, and inside, he saw computers and other business machines, drawers, and cabinets. AV-1 recalled redacted, Cristina and Oyuela Rodriguez entering and leaving the **Fairgrounds** contemporaneous with paychecks being handed out, and also for other business-related matters during fairs or fests.

66.     AV-1 never earned the rate of pay promised in his contract. Rather, he earned $9.50 per hour for normal work hours and $14.25 per hour for overtime. One day, AV-1 was ill due to his diabetic condition, but Cristina and **Rodriguez Oyuela** said that if AV-1 did not want to work, he could return to Honduras.

67.     **Oyuela Rodriguez** often threatened that he could have AV-1 and the other AVs deported. He would tell AV-1 that redacted had many contacts and personally knew a federal agent who could instantly deport AV-1 by putting him on a plane back to Honduras if AV-1 did not work hard and follow all instructions.

68.     At one point, while they were in the **trailer**, **Rodriguez Oyuela** told AV-1 he made $1,000 from redacted per Honduran national he brought to the U.S. on an H-2B visa and that he knew and/or worked with GO-1 in this venture. Inside the **trailer**, **Rodriguez Oyuela** had a ledger listing more than 30 names of additional Hondurans whom **Rodriguez Oyuela** had brought or was planning to help bring into the U.S. on H-2B visas.

69.     One night, while **Rodriguez Oyuela** was intoxicated, AV-1 took pictures of the ledger, which I reviewed. I noted the AVs' names, along with the names of various other Honduran nationals, along with unexplained dollar values placed beside those names. In running some of these names through a U.S. consular query, I note that many of these Honduran nationals either

entered or were in the process of entering the U.S. on H-2B visas with H-2B petitions prepared by redacted.

70.     AV-1 overheard **Rodriguez Oyuela** saying he sent other Hondurans he brought to California to cut pine trees and Alaska to work at a salmon fishery.  **Rodriguez Oyuela** told AV-1 he had the same plans for AV-1.

71.     **Rodriguez Oyuela** was a heavy drinker and once tried to fight AV-3 in AV-1's presence.

72.     The AVs could not move about freely, and AV-1 remembers **Rodriguez Oyuela** or Cristina being present whenever they went to the store for essentials.  If **Rodriguez Oyuela** did not walk with them, they would see **Rodriguez Oyuela** arrive at the same store shortly after their arrival.  The AVs were only allowed to go Mexican grocery stores nearby or, occasionally, a Walmart.

73.     redacted allowed only **Rodriguez Oyuela** to drive a company van off the WCAS property.  AVs 1 through 3 did not have drivers licenses to operate a vehicle in the U.S.  AV-1 and others tried to order Uber rideshare vehicles so that they could leave by themselves, but AV-1 recalled it would take three hours for a car to come to WCAS.  Once WCAS supervisors learned the AVs were trying to get personal transportation, WCAS supervisors such as **Rodriguez Oyuela** and Christina more closely monitored their telephone usage by asking what they were doing on the phone, or by noticeably watching workers while they were using their cell phones.

74.     After several weeks under these conditions, AVs 1-3 and H-2B 5 complained to **Rodriguez Oyuela** and Cristina, but nothing happened.  They then tried to phone redacted, but redacted did not answer their calls and nothing changed.

75.     Eventually, due to the AVs' complaints, a meeting was held where the AVs, **Rodriguez Oyuela**, Cristina, Raul, [redacted], [redacted] were present in person, and [redacted] (hereinafter "GO-2"), a purported colleague of GO-1 in Honduras, was present by telephone. The AVs divulged their concerns with being in Wisconsin instead of at [redacted] earning far less pay than they had been promised and not being allowed to leave. GO-2 told the AVs they were complaining too much and that [redacted] had done them a favor by moving them to WCAS in Wisconsin because [redacted] did not need them.

76.     At the conclusion of the meeting, [redacted] said he would have "his attorney" fix the victims' immigration paperwork, would raise the AVs' pay to $12 per hour, and would allow the AVs to freely leave the fairground. To AV-1's knowledge, [redacted] never fixed their H-2B paperwork, and he only allowed them nominal freedom of movement.[17]

77.     When the AVs tried to test their ability to leave, they found that they could not actually do so. Even if [redacted] said they could leave on the weekend, Cristina or **Rodriguez Oyuela** would tell them there were events they needed to work. AV-1 recalled receiving a purported weekend itinerary as proof the AVs could not leave that weekend, only to discover that, in fact, there were no WCAS events that weekend. AV-1 wanted to leave but did not know how to get back to Honduras if he left.

78.     Shortly after the meeting with WCAS staff, **Rodriguez Oyuela** and Cristina drove AVs 1 and 2 to Illinois, where AV-4 had been since they were separated at O'Hare Airport. AV-1 thought this was done to appease the AVs. AV-1 was worried about AV-4 but also wanted to use the opportunity to travel from Wisconsin to Chicago to figure out how to escape from the

---

[17] AV-1 maintained pay stubs, and his final pay stub, on July 9, 2021, shows a wage increase to $12 per hour. This rate was still substantially less than the contract H-2B wage that AV-1 was promised and the wage rate required under the H-2B visa program.

22

situation at WCAS if necessary.  During AV-1's visit to Illinois, the AVs from Wisconsin informed AV-4 they intended to call the national human trafficking hotline in order to escape.  AV-4 told AV-1 he wanted to be part of their escape plan.

### ii.  Statements Made by AV-2

79.     AV-2 is a 30-year-old Honduran national who sought work in the U.S. in order to support his mother and sister, and because he wanted a reprieve from the frequent assaults and violent episodes he experienced while commuting or working in Honduras.  In 2020, he attended a PTH job fair and applied for an H-2B visa.

80.     Approximately one year later, AV-2 received a call from GO-1 in which he learned of the opportunity to work landscaping for redacted in Michigan.  AV-2 was excited for this opportunity, as he had previously worked a landscaping job in Honduras and enjoyed it.  AV-2 was promised $15.40 per hour, and the terms of the employment were laid out in a written contract that AV-2 signed and returned via email.  AV-2 presented agents with a copy of this contract, which reflected the same H-2B visa employment conditions as discussed above.

81.     GO-1 told AV-2 that redacted was the person in the U.S. who had arranged the employment opportunity for him and that **Rodriguez Oyuela**, a Honduran national who worked for redacted would be assisting AV-2 and answering all of his questions.  AV-2 and **Rodriguez Oyuela** communicated with each other and with the other AVs via the cell phone messaging and call application WhatsApp.

82.     Prior to AV-2 coming to the U.S., GO-1 told AV-2 that redacted had a surprise for all of the AVs, which was that redacted was going to petition the U.S. government to extend their H-2B visas for the maximum duration of 3 years, and that he would create a path toward permanent

23

residency and even U.S. citizenship for them. AV-2 felt extremely fortunate to have this opportunity.

83.     Just a few days before the group departed for the U.S., and after AV-2 had already had his visa interview, GO-1 sent the workers a message saying something about a job at "Walworth" and another at "Fantasy Amusements." AV-2 did not to know what or where these companies were, and he had heard GO-1 mention many other job opportunities, such as in California and Alaska. So far as he understood, however, he was only supposed to be working the job indicated on his visa and in his contact, which was for <span style="background-color:#000;color:#f00">redacted</span> in Michigan.

84.     When he arrived in the United States, however, AV-2 was part the group of four workers who were taken to work for WCAS at the **Fairgrounds**. AV-2 was unhappy about having to work doing things like shoveling horse manure and repairing equipment at the Walworth County Fairgrounds instead of doing the landscaping work he had contracted for, and he was very worried about working outside the terms of his H-2B visa.

85.     AV-2 complained to **Rodriguez Oyuela** about this. **Rodriguez Oyuela** told AV-2 that there had been a list-minute change and that <span style="background-color:#f00">redacted</span> was working on changing the terms of the petition, but it would take time. **Rodriguez Oyuela** also told AV-2 that he had worked in other worksites for <span style="background-color:#f00">redacted</span> including cutting pines in San Diego and fileting salmon in Alaska, and that all of them would be completing the same circuit of employers together this year. **Rodriguez Oyuela** promised that the money in Alaska would be better and that if they worked hard and completed three years of this circuit for <span style="background-color:#f00">redacted</span>, J<span style="background-color:#f00">redacted</span>would eventually make them all legal permanent residents.

86.     **Rodriguez Oyuela** also spoke of getting $1,000 per H-2B visa worker whom he groomed and supervised for <span style="background-color:#000;color:#f00">redacted</span> in the same manner he had done with AV-2 and the other

AVs. **Rodriguez Oyuela** said he expected that 36 such workers would be arriving from Honduras soon, and about the plans he had to buy property in Honduras with that money. He also mentioned that he had recently given GO-1 $4,000 that he had received from redacted, for her role in directing visa workers to him. **Rodriguez Oyuela** told AV-2 that he had known GO-1 for a long time.

87.    AV-2 said that on his first full day at the **Fairgrounds**, Cristina, redacted and redacted took his passport temporarily and made a photocopy of his H-2B visa inside the **Katzman Administration Building**. He stated and showed agents that the H-2B visa in his passport clearly lists his authorized employer as redacted and the employment location as Michigan. He also remembered completing paperwork and being instructed to list redacted's address rather than that of WCAS.

88.    AV-2 was also negatively surprised when he received his first paycheck. AV-2 stated that his paychecks came weekly from the **Katzman Administration Building** and described essentially the same procedure described by AV-1. This included signing the checks at the **Katzman Administration Building** and immediately "cashing" them with the WCAS onsite. AV-2 recalled a female who worked at the **Katzman Administration Building** named "P."[18] AV-2 immediately noticed upon receiving his first check that his hourly wage was around $9, significantly less than what his contract promised.

89.    AV-2 recalled living in cramped conditions inside a **trailer** on the **Fairgrounds**, having to use public restrooms (the showers of which they were only allowed to access in the mornings before 7 a.m., and only so long as they were not already occupied by campground guests), and generally only being able to leave the **Fairgrounds** accompanied by **Rodriguez**

---

[18] I searched the WCAS website, https://www.walworthcountyfair.com/p/about/fair-board, and found mention of a WCAS Office Manager named "P.G.," who has the same first name identified by AV-2.

**Oyuela** or Cristina. AV-2 indicated that Cristina habitually spoke "strongly" to him and the other victims, berating and belittling them.

90. AV-2 noted that he and the other AVs were expected to be on call at any time of the day or night for jobs that needed to be done on the Walworth County Fairground. They were also once "leant" to Raul, the Mexican organizer, on a Saturday to work on his farm in the Lake Geneva area moving hay bales.

91. AV-2 explained that once he and the other victims arrived in the United States, they needed new phones and U.S. phone numbers. They asked repeatedly to be taken to a cellular phone store, but although **Rodriguez Oyuela** promised to take them, he never did. After a couple of weeks, even though it took several hours of waiting, AV-2 and the other victims were able to use an Uber to take them to a cellular phone store in a neighboring town. When **Rodriguez Oyuela** saw that they had purchased new phones, he demanded to know how they had gotten to the store. He warned AV-2 and the others that <span style="background-color:#8B0000; color:#8B0000">redacted</span> would not approve of them going out without him and warned them never to do so again. AV-2 said this was the first time he realized that they were not allowed to move about freely, even during non-work hours.

92. On another occasion, AV-2 and the other victims asked to be allowed to travel to Chicago on the weekend, just to see the city. **Rodriguez Oyuela** and Cristina told them they could not leave because they were going to be needed to work an event on the **Fairgrounds** that weekend. AV-2 said they sat waiting in their **trailer** all weekend, but they were never asked to work. This further supported AV-2's belief that he and the other victims were not free to leave.

93. **Rodriguez Oyuela** often told AV-2 that he should not contact <span style="background-color:#8B0000; color:#8B0000">redacted</span> directly about his concerns. **Rodriguez Oyuela** said that this would get back to J<span style="background-color:#8B0000; color:#8B0000">redacted</span>, and that J<span style="background-color:#8B0000; color:#8B0000">redacted</span> would be displeased if he found out that AV-2 had jumped the chain of command by not dealing strictly

26

with their immediate supervisor, **Rodriguez Oyuela**. AV-2 also believed it would be futile to complain to redacted about **Rodriguez Oyuela** or the situation because he believe redacted was already aware of the issues.

94. AV-2 described two meetings that were purportedly held to address his and the other victims' concerns. The first involved AV-2 and the other victims meeting **Rodriguez Oyuela** in the horse stables on the **Fairgrounds** to call J redacted. **Rodriguez Oyuela** dialed redacted on his phone, then walked away to speak with him privately first. When he returned, he had redacted on speakerphone. The victims asked redacted why they were not taken to work in Michigan in accordance with their H-2B visas. redacted replied that redacted was going to charge them each $75 for lodging and bill them for other expenses, so they were fortunate to be in Wisconsin instead. He also claimed that their visas were valid for three years and that they should not be concerned if they remained in the U.S. after the expiration date marked on them, because he had filed a new petition for them. The victims were never shown this supposed petition.

95. The second meeting occurred inside the **Fairgrounds**, and redacted redacted, Raul, and Cristina were also present. GO-2 appeared from Honduras by phone. **Rodriguez Oyuela** had told redacted that GO-2 was J redacted s representative, but it was revealed during the call that GO-2 worked for the PTH office of the Honduran government. Like AV-1, AV-2 recalled that GO-2 was displeased that they were "complaining" about the bait-and-switch, the pay, and the work conditions. He said this was an embarrassment and that AV-2 and the others should be grateful to have a job at all, because at the last minute, redacted had decided it did not want them anymore.

96. Following that meeting, redacted promised to have "his attorney" straighten out the H-2B situation and to increase the AVs' pay to $12 per hour. While their pay did increase, AV-2

27

and the other AVs never heard from an attorney, and their work conditions only got more difficult from there on out.

97.     AV-2 recalled a night when he was working selling beer tickets.  He had an upset stomach needed to use the bathroom.  He discovered, however, that the closest bathroom was occupied.  He asked Cristina's permission to use the bathroom in the lodging trailer, and Cristina gave him the key.  Moments later, redacted came looking for AV-2 and was furious that he had left his post.  Cristina denied knowing where AV-2 had gone.  When AV-2 returned a few minutes later, redacted screamed at AV-2, "Where the fuck have you been?," and he threatened to send AV-2 back to Honduras.

98.     AV-2 was extremely disturbed and frightened by this incident and decided he needed to find a way out.  He and the other AVs located a pamphlet given to them at the American Consulate in Tegucigalpa and called the number listed there for reporting labor trafficking. Although it took a couple of tries, NGO B eventually connected them with the Wisconsin Department of Workforce Development, who referred them to NGO A.

99.     Meanwhile, AV-2 was aware that AV-4 was extremely depressed in Illinois.  He was working very long hours, such as from 4 p.m. on a Friday until noon on a Sunday, for very little pay, and he was beginning to drink.  AV-2 became aware of this because **Rodriguez Oyuela** would talk to AV-4 on speakerphone in front of AV-2.  AV-2 heard **Rodriguez Oyuela** repeatedly tell AV-4 that he just needed to stick it out and that eventually, things would get better.

100.    Near the time when AV-2, AV-1, and AV-3 left the Walworth County Fair, **Rodriguez Oyuela** and Cristina took AV-1 and AV-3 from the Eastern District of Wisconsin to visit AV-4 in Illinois for a few hours, in an apparent effort to maintain the status quo and make

sure AV-4 did not run away, as his fellow Honduran H-2B worker had already done. Shortly thereafter, AV-4 was also assisted by NGO A.

### iii. Statements Made by AV-3

101.    AV-3 is a 22-year-old Honduran national from a poor part of the Honduran capital, Tegucigalpa, who pursued post-secondary marketing education and athletics with help from his mother. The family earned just enough income to survive, primarily spending money on clothing and food. AV-3 lived with multiple siblings and his mother, and he considered himself the main breadwinner for his family. In Honduras, AV-3 could only earn around $100-200 per week, so he decided to attend a job fair sponsored by the PTH to seek better opportunities.

102.    At the job fair, AV-3 learned of the opportunity to come to the U.S. to work for redacted This opportunity provided AV-3 a chance to earn in one work season in the U.S. more than he could earn in several years working in Honduras.

103.    During various meetings with GO-1, AV-3 learned that redacted was the main U.S. organizer of AV-3's labor opportunity. GO-1 also explained that **Rodriguez Oyuela** was redacted's primary point of contact while in the U.S. AV-3 identified a photograph of **Rodriguez Oyuela** as the person to which GO-1 referred to as "Denis" and the person who oversaw the AVs' working conditions at the **Fairgrounds**.

104.    AV-3 received a contract in Spanish from GO-1 stating that he would be performing landscaping work in Michigan, earning $15.40 per hour for regular time and $23.10 per hour for overtime. After the victims arrived in Chicago, however, redacted communicated to AV-3 that the six travelers would separate into two groups. AVs 1-3 and H-2B 5 were taken to the **Fairgrounds**, while AV-4 and H-2B 6 were taken somewhere in Illinois in a separate vehicle.

29

105.    AV-3 also described living in a **trailer** with bunk beds at the **Fairgrounds**.  He recalled that there was a surveillance camera at the top of the nearby grandstands that was pointed directly at the **trailer**.

106.    Shortly after AV-3 arrived in Wisconsin, **Rodriguez Oyuela** told AV-3 that redacted had been a "ghost" company, used solely for the purpose of getting the AVs into the U.S.  AV-3 recalled feeling "terrified" that he had been put into a work situation that was unlawful, because AV-3 had never broken the law.

107.    **Rodriguez Oyuela** also told AV-3 that he received $1,000 per person he helped to bring into the U.S. to work.  **Rodriguez Oyuela** said he once received $5,000 from redacted, and that when he would receive such a bonus, he would kick back some of the money to GO-1 and others from the PTH.

108.    AVs 1-3 and H-2B 5 were required to get COVID-19 vaccines after they arrived at the **Fairgrounds**.  The day after they received their vaccines, they all had side effects that made them feel unwell and unable to work, however **Rodriguez Oyuela** required them to work anyway.  AV-3 also remembered having to work until 1 or 2 a.m. on several occasions.

109.    **Rodriguez Oyuela** was combative and adversarial with AV-3.  On one occasion, he swung at AV-3, but AV-3 blocked his punch.  **Rodriguez Oyuela** would also scream at AV-3 and lock him out of the **trailer** or threaten to call the police on him if they had a disagreement.

110.    AV-3 often expressed that he wanted to go home, but **Rodriguez Oyuela** would threaten AV-3 that he would call redacted, and that redacted would make sure AV-3 would lose his visa and be deported, causing him to be ineligible for future opportunities to work in the U.S.

111.    AV-3 explained that his schedule involved more work during weekends and less during weekdays, but they were always at the beck and call of WCAS staff.  If AV-3 went with

other AVs to the nearby Mexican store, **Rodriguez Oyuela** would either insist on taking them, or he would strangely show up, pass by, or already be inside of the store when they went. According to AV-3, redacted told him and the others that they could not leave the **Fairgrounds** on their own, even on a weekend where there were no events scheduled.

112. AV-3 recalled receiving checks from various WCAS staff, and AV-3 had to sign those checks. A staff member would return shortly thereafter with a WCAS envelope containing an amount of U.S. currency matching the net amount of the paycheck he had signed.

113. AV-3 stated that the **administrative offices** were located near the middle of a row of buildings to the southwest of their **trailer** on the WCAS fairgrounds. AV-3 saw items consistent with a business operations center inside the **Katzman Administration Building**, including computers, files, documents, and conference rooms, and he recalled a "secretary" who worked there on business matters related to WCAS events.

114. Other case agents and I have reviewed check stubs retained by AVs 1 through 3, which came from business operations at the **Fairgrounds**. All checks issued to the AVs bore their true names and referenced "redacted ."

115. After the AVs began complaining about their working conditions, they attended meetings inside the **Katzman Administration Building**, which AV-3 was able to identify from a photograph, with **Rodriguez Oyuela** and Cristina. AV-3 recorded portions of these meetings surreptitiously because he wanted to memorialize what he believed was an unlawful situation that he and the other AVs had been put into.

116. AV-3 recalled one meeting with redacted and Cristina that he recorded where he and other AVs were admonished by GO-2 over the phone for complaining about their situation. After sharing their concerns about the illegality of their presence in Wisconsin, Cristina and redacted

31

informed the AVs that their wage rate would be raised to $12 and their immigration paperwork would be fixed by [redacted].  Based on my review of consular and immigration databases, none of the AVs immigration statuses were ever "fixed" or amended to reflect their true work circumstances.

117.    AV-3 gave law enforcement consent to forensically examine his cellular telephone, which he used to record portions of these meetings with WCAS officials.  I reviewed and translated one of the recordings made by AV-3 on July 5, 2021, which had portions in Spanish and English.[19] I deduced the identities of the speakers through hearing their names spoken in the recording, understanding the context of their roles based on the nature of the conversation, and through confirming their voices with assistance from AV-3.  The following are only portions of the recording:

GO-2 [English translation]: "…From what… uh… I know… uh… you… uh… had signed a contract; yes, we are in agreement that it was a contract for Michigan.  Still… uh… in the end… uh… it could not come to be through that company, so then… uh… [redacted]]… I do not know if you know him, uh, he provided… he helped us to be able to make you happy with him…  Uh… if, if it was not like this… uh… you all would already be returning to Honduras and you would have lost your contract.  Uhmm… the, the truth is... uh… it is tough [painful] the circumstances that are happening to you all, if it is true, that your, your contract was for more money.  Still, uh, he could help you with this; what could come of this came.  Uh… he has not been able… uh… to make the other place sign the contract for [unintelligible].  Uh… if, I have heard about some of, as if some of you want to return to the country.  Well, I would like to know the names, because we, that is what we will speak with and communicate to [unintelligible] the U.S. Embassy in Honduras in order to… uh… revoke your visa…"

[redacted] [English]: "So, can someone catch me up what's going on here on?  I don't understand any of it."

AV-2: "So, all right so what, um, [AV-1] is explaining, um, because he's telling, he was like, uh, that we need to go, that we had plans, or we said that we're trying to go back to Honduras, right?  And he say, if we go back to Honduras, they're gonna remove our visas, right?  And as well, um, they've been saying like, um, like, the way the contract… we don't have a contract.  So, we need a contract because when we applied for our visas, the consul

[19] I am proficient in spoken and written Spanish, and I frequently conduct Spanish language interviews and translations in the course of my law enforcement duties.

there told us that we need to stay on the, on the state that we're supposed to be, the company, which is Michigan…"

redacted: "Okay…"

**AV-2:** "All right. And if we don't report that to the embassy, we're gonna get in problems right there in Honduras at the embassy. So that's the irregulation [sic] that we're trying to avoid. So we can keep coming here and work."

redacted: "Okay, all right. So, what is the solution, [GO-2]?"

**GO-2:** "We will try to sort this problems, in, um, we, uh, we speak with the authorities for maybe solve this..."

redacted "Okay. And do you work for redacted "

**GO-2:** "No…"

redacted: "Okay. I was told you work for [redacted], the immigration attorney—"

**GO-2:** "Okay…"

redacted "—that we worked with."

**AV-2:** "No, he work for the labor secretary."

redacted "You work for the labor secretary…okay."

redacted: "Would you be okay if I had the immigration company that helped us put this together contact you?"

**GO-2:** "Yeah, yeah."

redacted "And [GO-2], you know, I want—no one here has, no one has to stay…"

**AV-3:** "Yeah, we know, we know that. But the thing is, that, uh, we are being like… threatened… like we, if we leave here, they can take off our visa, and that visa is important…"

redacted "Would you rather do landscape work? Is it the pay or the work?"

**AV-3:** "No, no, no. That doesn't matter. It doesn't matter the pay and the work, right? The thing is that they bring us here, but not with the first contract. They, they don't know, they don't know, this… anything about this. It's the lie. You know? It's the action of lying. They give you a contract first with… a payment… and we make numbers because we need that money to our families. So that's why we are concerned about this situation."

33

redacted "This is a very big, big problem."

118.    Despite redacted's assertions that WCAS would work with redacted to fix the victims' immigration and labor situation, I have been unable to find any consular or immigration records suggesting that any documents were submitted by WCAS or their agents to address the fact that the four Honduran nationals were unlawfully present in the Eastern District of Wisconsin.

119.    AV-3 also recalled a meeting in the **Katzman Administration Building** that occurred on July 6, 2021.  I also listened to a recording of this meeting that AV-3 had made on his cellular telephone.  redacted was present by phone for this meeting.  redacted told the AVs he had emailed GO-1 to ask her to inform the AVs that there was no work for them in Michigan anymore and that their worksites were being changed.  redacted asked redacted to access his cellular telephone during the meeting to search for emails between redacted and GO-1 on which redacted was copied pertaining to this subject.  AV-3 indicated that redacted did.

120.    I reviewed WhatsApp messages in AV-3's cellular telephone that related to this subject.  It appears that a few days before their departure for the U.S., after the AVS' visa applications had been submitted and their visas had been issued, GO-1 sent AV-3 and some of the other workers a message that contained a screenshot of an email from redacted  The email said the job opportunity at redacted no longer existed and asked GO-1 if the AVs would be available to work either at "Walworth" or Fantasy Amusements.  AV-3 did not know where that was, and he was confused why there would be a change at the last minute.  The day before departure, AV-3 queried GO-1 where he and the others were supposed to say they were going—to "Walworth" or Michigan—and whether they would be receiving a new contract.  GO-1 replied that they should stick with the original plan and to use the name and location printed on their visas.

    **iv.  Statements Made by AV-4**

121.    AV-4 is a 23-year-old Honduran national who sought work in the U.S. in order to support his mother and two brothers. As the eldest son, he grew up performing grueling agricultural work to support his family. At age 13, AV-4 started training to be a fisherman, eventually earning around $320 a month. Later on, AV-4 took on debt to enroll in mechanical engineering school. He worked two jobs to pay for his classes, however when his grandmother was no longer able to assist him financially, AV-4 was forced to discontinue his studies.

122.    Shortly after leaving school, AV-4 returned to his mother's home and attended PTH job fairs in 2018 and 2019 to seek foreign employment. After a couple of unsuccessful attempts to work in the fishing industry in Europe, around April of 2021, GO-1 called AV-4's mother and stated there was work available for AV-4 in the U.S on an H-2B visa.

123.    AV-4 contacted GO-1, who added him to a WhatsApp group chat with other prospective H-2B visa workers, including AVs 1-3 and the two other Honduran nationals with whom the AVs traveled in June of 2021. This group chat was one of the means through which AV-4 learned of many of the specifics pertaining to the H-2B work. The group was told they would work at [redacted] in Michigan.

124.    Around one week after the commencement of the group chat, GO-1 instructed AV-4 to bring some identification documents to the PTH's office, 8 hours from where AV-4 lived. AV-4 made the round trip in a single day because he did not have enough money to get a place to stay for the night. AV-4 ended up having to borrow around $900 from friends in order to pay the fees for his paperwork and his travel to the U.S.

125.    GO-1 sent AV-4 and the others in the WhatsApp chat a work contract in Spanish that specified their wages and working conditions in the U.S., consistent with what was offered to AVs 1-3, as described above.

35

126. GO-1 told AV-4 that [redacted] was the person in the U.S. who had arranged the employment opportunity for him and that **Rodriguez Oyuela**, a Honduran national who worked for [redacted], would be assisting AV-4 and answering all of his questions.

127. **Rodriguez Oyuela** started a separate group chat with the AVs, explaining that while they would begin working in Michigan, it was possible that after the expiry of their original H-2B visas, they could have their visas extended to do work in other states. **Rodriguez Oyuela** gave the example of cutting pine trees, and he also mentioned possible opportunities in Florida and Alaska.

128. Later, **Rodriguez Oyuela** told the group that their visas were going to be good for three years. **Rodriguez Oyuela** told them that he was working in Wisconsin and had been there for a long time.

129. Even later, AV-4 began to wonder why it was taking so long for [redacted] to bring him and the other AVs over, especially when some of the other Honduran H-2B holders on the petition had already been brought to the U.S. **Oyuela Rodriguez** told them that he had contacted [redacted] and that the AVs would only be spending two weeks in Michigan with [redacted] because [redacted] no longer needed them. He told the AVs not to worry, that they would find additional work for them after the [redacted] contract had been completed.

130. Once AV-4 landed at O'Hare International Airport in Chicago, Illinois, AV-4 tried to reach out to **Rodriguez Oyuela** but the message did not go through. AV-3 then texted [redacted] who replied that the six travelers were going to separate into two different vehicles. AV-4 was very concerned about this.

36

131.    Outside the airport, AV-4 and H-2B 6 got into a vehicle with a white female named redacted redacted attempted to talk to H-2B 6 and AV-4 and commented that they spoke English well.

132.    Meanwhile, AV-4 and H-2B 6 were speaking to each other in Spanish about being scared, because they had no idea where either they or the other group of four H-2B workers were being taken.  At that time, they could not phone **Rodriguez Oyuela** or J redacted because their phones did not work in the United States.  When the two men would speak to one another in Spanish, redacted would ask them what they were talking about.

133.    After around one hour of driving, AV-4 arrived at a fair in a small town in Illinois.  redacted never told AV-4 or H-2B 6 during the car ride what they were going to be doing or where they would be working.

134.    AV-4 was taken to an office to meet redacted husband. redacted explained that they owned a company called Fantasy Amusements.  I note that Fantasy Amusements petitions for its own H-2B workers, utilizing J redacted as its preparer. redacted told AV-4 and H-2B 6 that he was excited to have them working for him because they were short staffed, and the carnival season was just starting.  AV-4 did not fill out any employment paperwork and had no idea what the working conditions would be.

135.    redacted took the men to a warehouse, where AV-4 saw a large group of workers from Mexico.  AV-4 learned that the workers from Mexico had arrived two weeks prior and had been kept unpaid in the warehouse because had not been any carnivals.  AV-4 believed there were about 29 workers from Mexico and 5 from Mongolia.

136.    AV-4 described the warehouse as being in the middle of nowhere, with nothing around them.  Even the nearest gas station was miles away.  AV-4 felt trapped and unable to run

37

because there was nothing close where he could run for help. AV-4 was also concerned because his work circumstances had changed very quickly, he did not have a phone that worked, and no one knew where he was or where to look for him if something happened to him. AV-4 felt they were so isolated that he and H-2B 6 could be killed and chopped up, and nobody would know.

137.    [redacted] showed AV-4 to the bunk houses and promised him and H-2B 6 their own rooms. AV-4 described the bunk houses as trailers with very small rooms. AV-4 looked at his bed and did not think that he was going to be able to fit. In order to get into the bed, he had to move his suitcase out of the room, climb into the bed, then pull his suitcase back into the room.

138.    H-2B 6's room was next to the toilet, and his sewage from the toilet leaked into his sleeping area. H-2B 6 messaged [redacted] around 1:00 a.m. that day and told her he was not going to sleep in this room because it was nasty, but [redacted] never responded. AV-4's room was also very dirty and dusty; however, AV-4 was so tired after traveling all day that he wrapped himself up in a jacket and fell asleep.

139.    When AV-4 woke the next morning, he felt sick from how dirty everything was. AV-4 asked a few of the workers from Mexico if he could use one of their phones or connect to their Wi-Fi and make a phone call. The Mexicans could only give AV-4 ten minutes of Wi-Fi, and with those ten minutes, AV-4 messaged his mom that he had arrived, that he did not know where he was, and that the plan had changed.

140.    AV-4 also messaged [redacted] shortly thereafter. The two Honduran H-2B's told [redacted] that they were unhappy and needed to talk to him because the job they were given was not the job for which they came to the U.S. H-2B 6 told [redacted] that they were unhappy with the living conditions, that they did not even fit in their beds, and that the living conditions were squalid.

38

141.    AV-4 told [redacted] that his visa was for work in Michigan, but [redacted] evaded answering him. [redacted] kept saying that they needed to figure out the problem and then find a solution. J[redacted]s told AV-4 that he is in charge of 37 companies in the U.S., and if the job did not work out, Judkins could take AV-4 to one of the other companies. AV-4 told [redacted] that he and H-2B 6 wanted to be with the other four Hondurans they came with, but J[redacted] did not address the request.

142.    After purchasing a new phone, AV-4 called AV-3, who was in Wisconsin, to see how he and the other guys were doing. AV-4 told AV-3 that they were in the middle of nowhere. While they were talking, AV-3 said that **Rodriguez Oyuela** kept coming by him to hear what they were saying. AV-4 told AV-3 they needed to talk to AV-3 without **Rodriguez Oyuela** around.

143.    **Rodriguez Oyuela** kept asking AV-3 who he was on the phone with and saying that **Rodriguez Oyuela** needed to talk with them. When **Rodriguez Oyuela** got on AV-3's phone, AV-4 told **Rodriguez Oyuela** they could not fit in their beds, the rooms were squalid, and there was expired food in the trailer. **Rodriguez Oyuela** said that the only important thing was that they had hot water and a place to lie down. **Rodriguez Oyuela** told them they did not come to the Whitehouse. According to **Rodriguez Oyuela**, they needed to work hard and put in more effort.

144.    AV-4 continued trying to contact [redacted] to express the need to be moved to where the other four H-2B workers were located in order to be safe. AV-4 felt his Honduran co-travelers knew they needed to take care of each other. After they did not receive a satisfactory answer from [redacted] AV-4's only Honduran companion, H-2B 6, ran away from the fair in Illinois.

145.    AV-4 said that being alone, he was terrified of what could happen to him, he had no one to talk to or go anywhere with, and he had no one to protect him if he decided to escape.

39

146.    AV-4 did not sleep well, and he became ill.  AV-4 also began drinking and smoking to cope with the stress and anxiety.  He wanted to go home to Honduras but knew he was stuck and would have to deal with the circumstances until he could figure out where he was, or until he could save money to do something about his situation.  He knew he had a debt back home and could not return until that debt was paid back.

147.    The next morning was AV-4's first day of work.  Instead of working in landscaping, AV-4 was instructed by ▆▆▆ to staff children's gaming booths with a traveling fair.  The fairs generally opened on Wednesdays or Thursdays and would run over the weekend.  On Wednesday or Thursday, the fairs would run from 6:00 p.m. till about 11:00 p.m.  On Friday, Saturday, and Sunday, the fairs would generally run from 2:00 p.m. until midnight.  On some occasions, though, AV-4 had to work more than 24 hours straight.  For example, AV-4 had to work from 11 a.m. on Saturday, July 4 through 3 p.m. on Monday, July 6, with only a 15-minute break.

148.    On the first Sunday that AV-4 worked, after the fair was over, he was handed a helmet and told to start taking down the Ferris wheel.  AV-4 told the carnival operators he had never done anything like this before.  One of the managers told AV-4 that he could do it because he was tall, and they would give him directions.  AV-4 climbed up the Ferris Wheel and began taking it apart as directions were shouted to him from workers on the ground.

149.    ▆▆▆ generally paid AV-4 on Thursdays.  AV-4 is uncertain about his rate of pay because ▆▆▆ and ▆▆▆ did not provide him paystubs, however AV-4 never earned the $15.40 per hour he was promised in his contract.  One week, AV-4 was told he had worked 41 hours, and the amount of money he received was $198 (less than $5 per hour).

150.    Throughout AV-4's time with Fantasy Amusements, **Rodriguez Oyuela** would text or call AV-4 from the Eastern District of Wisconsin, asking him how things were going.  AV-

4 often did not answer, but **Rodriguez Oyuela** would call AV-4 when he was drunk in the middle

of the night and tell AV-4 that redacted was proud of AV-4. **Rodriguez Oyuela** told AV-4 that

he and redacted agreed that AV-4 should not try to leave or escape like the other "asshole" who left

(H-2B 6).

151.    In other telephone conversations with **Rodriguez Oyuela**, **Rodriguez Oyuela**

would threaten AV-4 with deportation if AV-4 left or did not work hard. **Rodriguez Oyuela** told

AV-4 that redacted is powerful and has many connections to make things happen with visas. AV-

4 was scared and believed that redacted had power based on the things **Rodriguez Oyuela** would

tell him.

152.    The third week that AV-4 worked for Fantasy Amusement, one of the H-2B

workers from Mexico left as well. After this second employee left, **Rodriguez Oyuela** began to

make AV-4 feel even more isolated by not returning his calls. During one of his final calls,

**Rodriguez Oyuela** reiterated that redacted was proud of AV-4, and if AV-4 kept working, redacted

would have other opportunities for AV-4. AV-4 believed that **Rodriguez Oyuela** was relaying

this information directly from redacted. **Rodriguez Oyuela** told AV-4 that J redacted had offered to

fix AV-4's contract and work on getting him legal permanent residency in the U.S. **Rodriguez**

**Oyuela** said redacted would also work on bringing AV-4's girlfriend or family to the U.S. as well

so long as AV-4 kept working.

153.    One day Cristina from WCAS and **Rodriguez Oyuela** drove AVs 1 and 3 from

Wisconsin to the Kane County Fair Grounds in Illinois. AV-4 met with **Rodriguez Oyuela** and

AVs 1 and 3.    They went to the fair grounds and were hanging out near the trailers when a Fantasy

Amusement staff member came outside and told AV-4 that he could not have visitors. AV-4 then

took the other AV's and **Rodriguez Oyuela** to another location on the grounds where other H-2B

workers were spending time. **Rodriguez Oyuela** began to drink, eventually trying to get AV-3 or AV-4 to solicit a female Mongolian H-2B for sex in exchange for $10,000. The AVs refused to communicate that request, and no such transaction occurred.

154.    While **Rodriguez Oyuela** was drunk and distracted, AVs 1, 3, and 4 went to the bathroom together. As they walked, AVs 1 and 3 started to share with AV-4 what was going on with them in Wisconsin and that were planning to contact the national human trafficking hotline.

155.    Shortly thereafter, one of the Wisconsin AVs received a phone call from Cristina who said she would leave them if they did not get back to the vehicle. **Rodriguez Oyuela** and AVs 1 and 3 left Illinois in a hurry, and AV-4 believed they were traveling back to Wisconsin.

156.    A few days after AVs 1 and 3 visited AV-4 in Illinois, AV-3 connected AV-4 with NGO A. In July of 2021, AV-4 phoned NGO A to ask for help, and they helped him to safely exit the situation.

## IV.    PROBABLE CAUSE TO SEARCH ELECTRONIC STORAGE MEDIA

157.    As described above and in Attachment B, I am seeking permission to search for certain records and information relating to violations of Title 18, United States Code, Sections 1001 (false statements), 1351 (fraud in foreign labor contracting), 1546 (fraud and misuse of visas, permits, and other documents), 1341 (mail fraud), 1343 (wire fraud), 1349 (wire and mail fraud conspiracies), and 1589 (forced labor) committed by **Rodriguez Oyuela** and that may be found on the **Fairgrounds**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, other digital storage media, or cellular telephone(s). Thus, the warrant applied here for would authorize the seizure of electronic storage media and copying of electronically stored information, all under Rule 41(e)(2)(B).

158.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.

159.    If a computer or storage medium is found on the premises, there is probable cause to believe that the above-described evidence will be stored on that computer or storage medium, for at least the following reasons:

      a.    Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b.    Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.    Wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.

      d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

160.    I am aware that in most cases, a thorough search of a premises for information that might be contained on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and

43

completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Also, storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical issues. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. Taking the storage media off-site and reviewing it in a controlled environment allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

161. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging or otherwise copying storage media that reasonably appear to be capable of containing some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

162. I know that enterprises engaged in fraud schemes that are intermingled with legitimate businesses tend to keep detailed, long-term business records for tracking purposes, to satisfy tax reporting and other legal requirements, and to lend an air of legitimacy to their operations.

44

163. In this case, because the **Fairgrounds** is the business center of the WCAS and the Walworth County Fairgrounds, based on the victim statements and corroborating evidence outlined above, there is probable cause to believe that paper and electronic records exist to document the time during which the AVs provided labor services at the WCAS fairgrounds in contravention of the contracts and promises made to the AVs before they entered the U.S.

164. There is also probable cause to believe that certain business communications were remitted electronically due to the fact that WCAS's own petition was remitted electronically to redacted for purposes of seeking U.S. H-2B visas. Additionally, regardless of the meticulousness of record keeping during the normal course of operations, WCAS is required to maintain their U.S. visa petition records for a period of up to three years based on federal regulations which WCAS acknowledged and to which they attested.

165. Based on the foregoing facts, I respectfully submit that probable cause supports the issuance of the requested search warrant, criminal complaint, and arrest warrant.